[No. A090906. First Dist., Div. Five. Apr. 23, 2001.]

In re LUKE W., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
LUKE W., Defendant and Appellant.

## COUNSEL

Joseph Shipp, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Ronald A. Bass, Assistant Attorney General, Catherine A. Rivlin and Michael E. Banister, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**JONES, P. J.**—Luke W. appeals from an order sustaining a supplemental petition (Welf. & Inst. Code, § 602) that alleged he possessed a concealed dirk or dagger. (Pen. Code, § 12020, subd. (a).) He contends the knife found in his possession is not a statutorily prohibited dirk or dagger.

### BACKGROUND

Appellant was declared a ward of the juvenile court and placed on probation under home supervision after the court sustained a petition alleging he possessed marijuana for sale and possessed psilocybin.

Four months later Lafayette Police Officer Dan Hoffman saw appellant walking in the company of a man Hoffman knew to be on parole. Hoffman knew appellant and knew he was on probation and subject to a search condition. He stopped appellant and asked if he possessed any illegal substances or weapons. Appellant replied he did not. Hoffman searched appellant and found a small, rectangular object in appellant's pocket.[1] It resembled a thick credit card and contained knobs and grips. When Hoffman pulled on one of the grips, a knife "came out."

Hoffman asked appellant why he was carrying the object. Appellant replied, "Well, you never know what can happen; it's for my protection."

Appellant disputed telling Hoffman he carried the object for protection. According to appellant's testimony, Hoffman initiated the subject by asking him, "Are you using that for protection?" Appellant replied, "Well, yes, I guess you could use it for protection."

### DISCUSSION

■ Appellant contends the device seized by Officer Hoffman was not a statutorily proscribed "dirk or dagger."

The supplemental petition alleged that appellant violated Penal Code section 12020, subdivision (a),[2] which forbids, inter alia, carrying "any dirk or dagger" concealed on one's person. (§ 12020, subd. (a)(4).)

The definition of "dirk or dagger" as used in section 12020 has been the subject of frequent legislative attention in the last decade. (See *People v.*

---

[1]It is unclear from the record whether the object was in a trouser, jacket, or shirt pocket.

[2]Unless otherwise indicated all further section references are to the Penal Code.

*Rubalcava* (2000) 23 Cal.4th 322, 328-332 [96 Cal.Rptr.2d 735, 1 P.3d 52]; *In re George W.* (1998) 68 Cal.App.4th 1208, 1212-1214 [80 Cal.Rptr.2d 868] (*George W.*) In 1993 section 12020 was amended to define "dirk or dagger" as "a knife or other instrument with or without a handguard that is primarily designed, constructed, or altered to be a stabbing instrument designed to inflict great bodily injury or death." (Stats. 1993, ch. 357, § 1, p. 2155.)

In 1995 "dirk or dagger" was redefined as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death." (Stats. 1995, ch. 128, § 2.)

In 1996 Assemblymember Diane Martinez, the author of the 1995 legislation, published a letter in the Assembly Journal expressing concern that the broad definition of dirk or dagger in the 1995 statute had the unanticipated result of including folding knives and pocketknives. (*George W., supra,* 68 Cal.App.4th at p. 1213.) She wrote that the California District Attorneys Association, which sponsored the 1995 legislation, " 'sought to eliminate the "primarily designed" language [of the 1993 statute] which had given rise to prosecutorial problems and to substitute language aimed at preventing surprise knife attacks by prohibiting the carrying of concealed knives that are particularly suited for stabbing and that are readily accessible to the user.

" 'According to a police training video prepared by the [district attorney] who drafted the 'capable of ready use' language [in the 1995 statute], folding knives are not "dirk or daggers," unless they are carried in an open and locked position. This is due to the fact that, when folded, they are not "capable of ready use" without a number of intervening machinations that give the intended victim time to anticipate and/or prevent an attack.

" 'Thus, the definition of "dirk or dagger" [in the 1995 statute sponsored by Assemblymember Martinez] was not intended to prohibit folding knives. I believe this is consistent with the intent of the Legislature.' " (*George W., supra,* 68 Cal.App.4th at p. 1213.)

In 1997 an amendment to section 12020 was introduced to enact the definition intended in the 1995 statute and to alleviate concerns of hunting knife manufacturers and sportsmen. The purpose of the amendment was "to expressly exclude from the definition of 'dirk or dagger' folding knives and pocket knives, which are not switchblades, and which are carried in a closed, secured state. Under the proposed amendment folding knives and pocket knives could only fit the definition of 'dirk or dagger,' that is, of 'being

capable of ready use as a stabbing weapon that may inflict great bodily injury or death,' if 'the blade of the knife is exposed and locked into position.'" (*George W., supra,* 68 Cal.App.4th at p. 1213.) A report to the Assembly Committee on Public Safety explained that the proposed amendment was an attempt to codify Assembly member Martinez's 1996 letter. (*George W., supra,* at p. 1214.)

Under the 1997 amendment, which controls the present case, "dirk or dagger" is defined as "a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k [i.e, a switchblade], or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position." (Stats. 1997, ch. 158, § 1.)

At the parties' request we have examined the object seized by Officer Hoffman. It is three and three-eighths inches wide, two and one-eighth inches high, and one-eighth inch thick. At first glance it closely resembles an audiocassette tape. The upper left corner of the front side bears the word "VISA," underlined with an abstract curved line. The diagonally opposed lower corner of the front side contains the numbers "007" immediately followed by the silhouette of a handgun. Superimposed thereon is the phrase "Tomorrow Never Dies."

Embossed in black along the top of the back side is a three-inch ruler and embossed along the bottom of the back side is a five-and-one-half centimeter ruler.

Viewed from the front side, the object contains a compass and round magnifying glass in the upper right. They do not protrude from the surface of the object. On the middle of the left end are two knobs, approximately one-eighth inch square, which also fit flush with the object. If one knob is pulled, one-inch-long plastic tweezers emerge from the object. A one-inch-long plastic toothpick emerges by pulling on the other knob.

Again viewed from the front, there is a one-fourth-inch ridged circle generally in the center of the object, one-fourth inch from the top. There is a like corresponding circle on the back side. By placing one's thumb on the front circle and forefinger on the back circle and pulling, a shiny silver metal hooked can/bottle opener emerges; it is not attached to the case. The can opener contains a small squared extension that may be used as a screwdriver. The can opener clicks into place when it is fully retracted into its slot.

Midway down the right side of the object, approximately one-half inch from the outer edge, is another one-fourth-inch ridged circle, also with a corresponding circle on the back side. By placing the thumb and forefinger of one hand on these circles and pulling, while holding the left end of the object with the other hand, a knife emerges. Like the can opener, it is a separate, unattached item. The total length of the knife is approximately three and one-eighth inches: two and one-fourth inches of blade, which is approximately one inch wide at its widest, and three-fourths inch of plastic butt. The upper and lower sides of the blade are curved and taper to a sharp point. The bottom side of the blade is partially serrated. The knife also clicks into place when it is fully retracted into its slot.

Given its size and variety of tools, this object is similar in function, albeit not in appearance, to the familiar Swiss Army pocketknife.

Appellant contends the object fits the definition of knives excluded from the statutory definition of "dirk or dagger" because it is a pocketknife whose blade is carried in a retracted, unexposed state. The People rebut that it is not a pocketknife because it does not have a blade that folds into an attached handle, the common definition of "pocketknife." (Webster's New Collegiate Dict. (1981) p. 879.)

The primary duty of a court when interpreting a statute is to give effect to the intent of the Legislature, so as to effectuate the purpose of the law. (*People v. Woodhead* (1987) 43 Cal.3d 1002, 1007-1008 [239 Cal.Rptr. 656, 741 P.2d 154] (*Woodhead*).) To determine intent, courts turn first to the words themselves, giving them their ordinary and generally accepted meaning. (*People v. Craft* (1986) 41 Cal.3d 554, 559-560 [224 Cal.Rptr. 626, 715 P.2d 585].) If the language permits more than one reasonable interpretation, the court then looks to extrinsic aids, such as the object to be achieved and the evil to be remedied by the statute, the legislative history, public policy, and the statutory scheme of which the statute is a part. (*Woodhead, supra,* 43 Cal.3d at p. 1008.) If a statute is susceptible of two reasonable constructions, the one that is more favorable to the defendant will be adopted. (*Bowland v. Municipal Court* (1976) 18 Cal.3d 479, 487-488 [134 Cal.Rptr. 630, 556 P.2d 1081].) Ultimately, the court must select the construction that comports most closely with the apparent intent of the Legislature, with a view to promoting rather than defeating the general purpose of the statute, and it must avoid an interpretation leading to absurd consequences. (*People v. Jenkins* (1995) 10 Cal.4th 234, 246 [40 Cal.Rptr.2d 903, 893 P.2d 1224].)

Section 12020 contains no definition for "pocketknife." We agree that a pocketknife is most commonly thought of as one in which the blade

folds into its attached handle. However, the statute exempts from the "dirk or dagger" proscription both folding knives generally (unless they qualify as switchblades) and pocketknives. In construing a statute, every word thereof is, if possible, to be given meaning so as to avoid surplusage. (*People v. Avena* (1996) 13 Cal.4th 394, 427 [13 Cal.4th 763b, 53 Cal.Rptr.2d 301, 916 P.2d 1000]; *Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 231 [110 Cal.Rptr. 144, 514 P.2d 1224].) If the Legislature had intended pocketknives to be accorded their common meaning, it would not have been necessary to distinguish them from other folding knives, because, under their common meaning, they are already a species of folding knife. We conclude that the Legislature intended "pocketknife" to have a broader definition.

In light of the legislative history of the 1997 amendment to section 12020, particularly as expressed in Assemblymember Martinez's letter, the apparent intent of the amendment was to avoid criminalizing the carrying of knives that are not capable of ready use because they are carried in a closed, secured state. The usual practice in interpreting criminal statutes requires a strict construction of "dirk or dagger." (*People v. Bain* (1971) 5 Cal.3d 839, 850 [97 Cal.Rptr. 684, 489 P.2d 564]; *George W.*, *supra*, 68 Cal.App.4th at p. 1214.) Although they may not have folding blades, small knives obviously designed to be carried in a pocket in a closed state, and which cannot be used until there have been several intervening manipulations, comport with the implied legislative intent that such knives do not fall within the definition of proscribed dirks or daggers but are a type of pocketknife excepted from the statutory proscription.

The object containing appellant's knife fits readily and compactly into the pocket of any article of clothing. And whether housed in a loose or tight-fitting pocket, we conclude the knife blade cannot, given its snug fit, be easily extracted from its slot without using both hands: one hand or a substitute vice-like mechanism must hold the container steady, while the finger and thumb of the other hand pull at the designated ridged circles. As such, it constitutes a pocketknife exception to section 12020, subdivision (a).

The People also argue that even if appellant's knife can be characterized as a pocketknife, it is a prohibited switchblade. We disagree. Section 12020, subdivision (c)(24) does not exempt from the definition of "dirk or dagger" folding knives prohibited by section 653k. Section 653k prohibits carrying a switchblade, which is defined as a knife that (a) has the appearance of a pocketknife, (b) has a blade of two or more inches in length, and (c) is a spring blade, snap blade, or gravity knife, wherein the blade can be released automatically by a flick of a button, pressure on the handle, flip of the wrist or other mechanical device, or is released by the weight of the blade or any type of mechanism. (§ 653k.)

Although it functions like a classic pocketknife, the challenged object carried by appellant does not resemble one. We liken its appearance to a cassette tape, and Officer Hoffman understandibly likened it to a credit card. The blade measures two and three-fourths inches from the plastic butt, but it is not released by any kind of mechanism, nor can it be released by its own weight. As noted, it can only be extracted by manual manipulation of both hands: pulling its butt with one hand while holding onto the case with the other. It does not fit the statutory definition of "switchblade."

Because the knife seized from appellant does not fall within the statutory definition of "dirk or dagger," there was insufficient evidence to sustain the allegation of the supplemental petition. Therefore, the true finding of a violation of section 12020, subdivision (a) is reversed.

#### DISPOSITION

The judgment is reversed.

Stevens, J., and Simons, J., concurred.